**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION**

**UNITED STATES OF AMERICA**

**v.**                                                           **CASE NO. 1:23cr3-AW**

**DAVID EMANUEL**

_____/

## GOVERNMENT'S SENTENCING MEMORANDUM

COMES NOW, the United States of America, by and through its undersigned prosecutors, and respectfully submits the following sentencing memorandum on behalf of the United States.  The United States has reviewed the Pre-Sentence Report (PSR) dated October 12, 2023 (ECF Doc. 67).  The United States has no objections with the conclusions or guidelines calculations.  The United States asks this Court to impose a term of incarceration consistent with the guideline calculations; this is a sentence that is sufficient but not greater than necessary to serve the purposes set out within 18 U.S.C. § 3553(a).  A substantial prison sentence is necessary to reflect the seriousness of the offense, promote respect for the rule of law, and vindicate the public interest in preventing a recurrence of the offense.  The United States intends to make further argument in support of this recommendation at the sentencing hearing on October 19, 2023.

# I.    <u>BACKGROUND</u>

On July 26, 2023, the Defendant, David Emanuel, was convicted by a jury of six counts of violating 18 U.S.C. § 245(b)(2).  At trial, the evidence proved that the Defendant, behind the wheel of Ford F-250 truck, pulled up to a group of six elderly or adult men as they stood on the side of the road and shouted racial slurs and demanded that the group leave. The Defendant then sped away from the group, made a U-turn, crossed the embankment where the victims' cars were parked, and drove in the grass on the south side of the road and back to the driveway of his home.  Minutes later, the Defendant sped out of his driveway and accelerated towards the group as they stood on the edge of the road.  One of the victims in the group of six, F.D.D., stood closest to Defendant's path of travel at the edge of the road where the limestone met the grass. With only a few seconds to act, F.D.D. was able to jump into the grass; the Defendant missed striking him by inches.

Each of the six victims testified at trial, as well as eyewitness R.P., who was a contractor working with the victims that day.[1]  Each of the six victims – fathers,

---

[1] The men were present to visit property owned by M.D., which was heavily wooded and undeveloped. The five-acre property covers portions of the site of the 1923 Rosewood Massacre. During the first week of January 1923, at least eight people were killed during a week of racial violence. The rest of the Black community of Rosewood was driven from the area by white mobs who burned their homes, a church, masonic hall, and a store. The Black residents never returned. *See* Florida Board of Regents, *A Documented History of the Incident Which Occurred at Rosewood, Florida, in January 1923: Submitted to the Florida Board of Regents 22 December 1993*, *available at* http://edocs.dlis.state.fl.us/fldocs/regents/rosewood.pdf. On September 6, 2022, M.D. and his group planned to survey the property to make plans for a centennial memorial of the massacre.

veterans, historians, a preacher, a firefighter, a scientist, a devoted son, a grandson – took the stand and described knowing exactly what the Defendant meant when he yelled that they were "fucking niggers" that needed to "get out of these woods." Even those who could not hear the words that day described understanding exactly what was happening when the Defendant stopped his truck and started yelling. They described the terror they felt as the Defendant barreled toward them in that Ford F-250. The sound of rocks and limestone flying, of a diesel engine revving, the disbelief that a quiet morning was so suddenly and unexpectedly rocked by the Defendant's violence.

Other witnesses described the words the Defendant used to describe what he'd done. A Levy County Sheriff's Deputy described how the Defendant called the men "bastards" and "Black sons of bitches." A news reporter quoted the Defendant's admission verbatim: "I got in my truck and I came at those motherfuckers. I would have fucked up all those Black motherfuckers." A second Levy County deputy described arresting the Defendant at his home, Confederate flags and bumper stickers on full display, and the Defendant's words from the back of the cruiser— disbelief that he was "getting treated like this shit over a fucking nigger."

At the conclusion of a two-day jury trial, the jury found the Defendant guilty of all six counts of violating 18 U.S.C. § 245(b)(2), including that the Defendant used a dangerous weapon.

3

## II.   <u>LEGAL STANDARD</u>

As this Court fashions an appropriate sentence for this defendant, the Court must begin by calculating the Defendant's United States Sentencing Guidelines range. *United States v. Booker*, 543 U.S. 220 (2005); *United States v. Williams*, 435 F.3d 1350 (11th Cir. 2006)(*per curiam*).   After the Court makes this calculation, it "may impose a more severe or more lenient sentence as long as the sentence is reasonable." *Williams*, 435 F.3d at 1353 (quoting *United States v. Crawford*, 407 F.3d 1174, 1179 (11th Cir. 2005)).  That is, the Court is to properly calculate the defendant's guidelines range but, after doing so, it must consider the factors set forth in 18 U.S.C. §3553(a) and may tailor the defendant's sentence based on those factors.  The Eleventh Circuit has summarized the §3553(a) factors:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need for deterrence; (4) the need to protect the public; (5) the need to provide the defendant with needed educational or vocational training and medical care; (6) the kinds of sentences available; (7) the Sentencing Guidelines range; (8) pertinent policy statements of the Sentencing Commission; (9) the need to avoid unwarranted sentencing disparities; and (10) the need to provide restitution to victims.

*United States v. Ochoa-Torres*, 519 F. App'x 583, 584 (11th Cir. 2013).  The factors set forth in 18 U.S.C. §3553 mirror the reasons traditionally recognized for imposing sentence: (a) retribution, (b) deterrence, sometimes referred to as general deterrence, i.e., the need to deter others from committing like crimes, (c) specific deterrence,

4

i.e., the need to prevent the defendant from committing crime, and (d) rehabilitation. *Bullington v. Missouri*, 451 U.S. 430, 443 n.16 (1981); *United States v. Godfrey*, 22 F.3d 1048, 1058 (11th Cir. 1994).

### III.   <u>DISCUSSION</u>

The United States agrees with the sentencing guidelines as calculated in the Presentence Investigation Report (PSR).  This Court should impose a sentence in line within the correctly calculated guidelines range to reflect the seriousness of the offenses, promote respect for the rule of law, and vindicate the public interest in preventing a recurrence of the offense, and to avoid unwanted sentencing disparities.

*A. The Presentence Investigation Report Correctly Calculated the Defendant's Sentencing Guidelines Range*

The government concurs with the guideline calculations in the PSR and asks that this Court impose a sentence of incarceration within the guidelines range.  The government also requests that the Court apply the aggravated assault guideline, the victim-related adjustment, and the grouping calculation.

*1. Applicability of the Aggravated Assault Guideline*

The Base Offense Level for Count I is 18.  The offense level for a violation of 18 U.S.C. § 245(b) is found in U.S.S.G. § 2H1.1.  Section 2H1.1 directs the court to apply "the offense level from the offense guideline applicable to any underlying offense."  U.S.S.G. § 2H1.1(a)(1).  The underlying offense is aggravated assault

pursuant to U.S.S.G. 2A2.2.  Aggravated assault is any felonious assault involving a dangerous weapon and intent to cause bodily injury with that weapon. U.S.S.G. § 2A2.2, cmt. n. 1.  The jury determined beyond a reasonable doubt that the Defendant's assault involved a dangerous weapon.  ECF No. 55. The Defendant intended to cause bodily injury when he accelerated his truck directly at F.D.D., coming within inches of striking him.  As the Defendant admitted to the Miami New Times, "I got in my truck and I came at those motherfuckers.  I would have fucked up all those black motherfuckers."  At trial, [2] F.D.D. testified that, had he not jumped out of the way, the Defendant's truck would have struck him.  F.D.D. escaped without bodily injury only because he was quick on his feet.  M.D. testified that F.D.D. came within inches of losing his life.  R.P. testified that he could not believe F.D.D. had *not* been hit.  Additionally, the evidence established that, although the road could easily accommodate two vehicles, the Defendant drove directly toward the edge of the limestone where F.D.D. was standing.  *See* Gov. Exhibit 4A.  This evidence establishes that the Defendant intended to cause bodily injury with his truck.

---

[2] Because the government does not yet have trial transcripts, discussions about trial testimony are general.

## 2. Victim Related Adjustment

The jury's verdict in this case and the overwhelming evidence introduced at trial plainly establish that § 3A1.1(a) applies, and that the Defendant selected his victims based on their race.

The Court must apply a three-level increase to the Defendant's offense level if it finds that he intentionally selected the six victims in this case because of actual or perceived race or color. U.S.S.G. § 3A1.1(a). This determination must be made beyond a reasonable doubt by the finder of fact at trial. *Id*. In the instant case, after hearing the evidence presented at trial, the jury found beyond a reasonable doubt that the Defendant attempted to injure F.D.D. and intimidated and attempted to intimidate the other five victims because they were Black. ECF No. 55. Therefore, the three-level increase must be assessed.

The evidence supporting the jury's verdict was overwhelming. At the start of his attack, the Defendant drove straight past R.P., the White man accompanying the six victims, and stopped only when he reached the first Black person he encountered, M.D. He yelled at M.D., calling him a "fucking nigger" at least three times, according to the testimony of M.D. and R.P. When the Defendant called Miami New Times reporter Joshua Ceballos, he admitted that he "would have fucked up all those Black motherfuckers." When the Defendant was approached by Levy County Sheriff's Deputy Kristin Gerace, the first words out of his mouth were asking if she

was there about "the Black people deal."  In that initial interview, he referred to the men as "Black bastards" and "Black motherfuckers."  Days later, when the Defendant was arrested by Levy County Sheriff's deputies, he volunteered that he could not believe he was "getting treated like this shit over a fucking nigger."  At every opportunity, the Defendant voiced his racial bias and consistently invoked the race of the victims as he described them and his encounter with them.  At every opportunity, he used his own words to describe what he thought of his victims. There can be no doubt that the Defendant selected his victims because of their race. Accordingly, the three-level victim related adjustment in U.S.S.G. §3A1.1 must be applied.

### 3.  Applicability of the Multiple Counts Adjustment

The application of the Multiple Count Adjustment in the instant case is required by the Guidelines pursuant to U.S.S.G. §3D1.4.  As previously noted, the defendant's six counts of conviction are governed by U.S.S.G. §2H1.1 and involve six separate victims. With separate victims, U.S.S.G. §3D1.2(a) and (b) do not apply since both subsections explicitly require the same victim. U.S.S.G. §3D1.2(c) does not apply because none of the counts is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts. Finally, counts governed by U.S.S.G. §2H1.1 cannot be grouped pursuant to §3D1.2(d)

based on the plain text of the guideline, which explicitly excludes U.S.S.G. §2H1.1. *See* U.S.S.G. §3D1.2.

> B. *A Guidelines Sentence Complies with the Sentencing Purposes. (18 U.S.C. § 3553(a)).*

This Court is obligated to impose a sentence that is "sufficient, but not greater than necessary," to comply with the sentencing purposes enumerated in § 3553(a). The § 3553(a) factors demand a significant sentence in this case. The government asks that this Court heavily weigh the following aggravating considerations when determining its sentence.

> 1. *The Nature and Circumstances of the Offenses Warrant a Guideline Sentence (18 U.S.C. § 3553(a)(2)(A)).*

The nature and circumstances of the Defendant's offenses are disturbing. A group of six elderly and adult Black men stood along the side of a public road, doing unremarkable property work at land co-owned by M.D. This enraged the Defendant.[3] First, he drove up to the group of Black men – passing the White man who was present without incident, and instead driving directly to the first Black man he saw – and he demanded that the men leave. He revved his engine, power braked his truck, and demanded that the men "get out." The Defendant yelled racial slurs –

---

[3] The Defendant testified at trial that his conduct was the result of his belief that a man had cursed at his daughter. His daughter, C.S., testified at trial that she never told the Defendant that anyone had cursed at her, just that she'd had an interaction with a man. It is not lost on the Government that our nation bears a long history – including the Rosewood Massacre – of racial violence instigated by a perceived slight on a White woman.

words that were so degrading and dehumanizing that the victims could barely utter them during their trial testimony.   The Defendant then cut a U-turn through the ditch and drove on the grass back to his driveway, where he had time to contemplate his next move.   The victims described the instant terror they felt when they saw the Defendant coming toward them a second time, the fear that they were all about to be struck by his speeding truck.   The Defendant accelerated directly towards the area where the victims were standing, and came within inches of striking F.D.D.  He left no margin for error: had F.D.D. not been quick on his feet, the Defendant would have struck him.  M.D. testified – nearly in tears – of the fear he felt as he saw his son, F.D.D., come within inches of losing his life, because of the Defendant's conduct.  For the six victims who stood on the road that day in Rosewood, a morning that should have been utterly ordinary became a life-or-death situation, because of the Defendant's conduct.   The nature and circumstances of the offense demand a significant sentence.

The Defendant showed no remorse for his violent conduct.  In the days that followed the attack, he made further racially based statements to the Miami New Times, and to the Levy County Sheriff upon his arrest.  At every opportunity, the Defendant dehumanized and degraded his victims, airing his motivation for attacking them on the side of the street in Rosewood.

However, this type of crime has consequences that reach far beyond the harm caused to the named victims. Hate crimes, like the one committed by this defendant, put entire communities in fear that they too could become the victim of a senseless attack. No one should be afraid to park on a public easement or stand on a public road because of the color of their skin. When members of a community are forced to live in fear because of their race, no one is safe. Hate-fueled violence must be stopped and holding its perpetrators accountable is an important step, both to counteract the message of hate which the Defendant's crime sent to the broader community and as general deterrence to others who would perpetrate such violence.

The Guidelines calculation reflects the serious nature and circumstances of the Defendant's offenses.  The Defendant acted violently, nearly striking a man with his truck, simply because a group of Black men used a public road.  A guidelines sentence is a just reflection of "the harm done or threatened by the offense, and the public interest in preventing a recurrence of the offense." *United States v. Pugh*, 515 F.3d 1179, 1195 (11th Cir. 2008) (citing the legislative history of § 3553(a)).

> 2. *A Guidelines Sentence is Necessary to Promote Respect for the Law (18 U.S.C. § 3553(a)(2)(A)).*

As noted above, the Defendant has not accepted responsibility for his conduct. It is clear from the Defendant's own statements when he was arrested by the Levy County Sheriff that he believes the law does not apply to him, or at least that it should

not apply if his victim is Black.  At trial, the Defendant testified to the effect that he would not have engaged the victims if he had known that "all this" would happen. In other words, the Defendant did not regret his actions, he regretted learning that the law applies to him.  A significant sentence is appropriate to promote respect for the rule of law, and its equal application to those who target their fellow community members because of their race.

> 3. *A Guidelines Sentence is Necessary to Serve the Purpose of General and Specific Deterrence (18 U.S.C. § 3553(a)(2)(B) and (C)).*

The Defendant took the stand during the trial and denied that this incident was anything more than two men having an argument. The Defendant explicitly denied using racial slurs against the victims–despite audio and video evidence of his use of slurs—and denied driving in a manner designed to injure or intimidate the victims—despite telling the Miami New Times that he drove at the victims and would have "fucked up all those Black motherfuckers."  The Defendant's denials cannot be reconciled with the evidence in this case or the jury's verdict.  Indeed, even taken at his word, if something as minor as a call from his daughter could trigger the Defendant to immediate violence, then specific deterrence is necessary to protect the public from this Defendant's apparently uncontrolled violent outbursts.  Moreover, that the Defendant has chosen to deny rather than denounce the beliefs that

precipitated his actions signals to the government that there is still strong need to protect the public through specific deterrence.

There is also a substantial need for general deterrence, which remains one of the "key purposes of sentencing." *Pugh*, 515 F.3d at 1194 (quoting *United States v. Medearis*, 451 F.3d 918, 920-21 (8th Cir. 2006)). Every year, thousands of people are victims of crimes motivated by prejudice, most often racial prejudice. In recent years, the number of reported hate crimes overall, and the percentage of crimes which are motivated by racial bias has increased.[4] This Court's sentence must send

---

[4] Pursuant to Congressional directive, the FBI collects yearly data about crimes motived by prejudice based on race, religion, sexual orientation, or ethnicity. The FBI's yearly data reports (from 1995) are available online at https://ucr.fbi.gov/hate-crime and https://cde.ucr.cjis.gov/LATEST/webapp/#/pages/explorer/crime/hate-crime. The report reflects the following number reported hate crime incidents in previous years:

**2022:** 11,642 reported incidents, 56.43% of single-bias incidents motivated by racial bias (https://cde.ucr.cjis.gov/LATEST/webapp/#/pages/explorer/crime/hate-crime)

**2021:** 10,891 reported incidents, 61.07% of single-bias incidents motivated by racial bias (https://cde.ucr.cjis.gov/LATEST/webapp/#/pages/explorer/crime/hate-crime)

**2020:** 9,952 reported incidents, 63.5% of single-bias incidents motivated by racial bias (https://cde.ucr.cjis.gov/LATEST/webapp/#/pages/explorer/crime/hate-crime)

**2019:** 7,314 reported incidents, 55.8% of single-bias incidents motivated by racial bias (https://ucr.fbi.gov/hate-crime/2019/topic-pages/incidents-and-offenses)

**2018**: 7,120 reported incidents, 57.5% of single-bias incidents motivated by racial bias (https://ucr.fbi.gov/hate-crime/2018/topic-pages/incidents-and-offenses)

**2017**: 7,175 reported incidents, 58.1% of single-bias incidents motivated by racial bias (https://ucr.fbi.gov/hate-crime/2017/topic-pages/incidents-and-offenses)

**2016**: 6,121 reported incidents, 57.5% of single-bias incidents motivated by racial bias (https://ucr.fbi.gov/hate-crime/2016/topic-pages/incidentsandoffenses)

a strong message that acts of hatred and violence motivated by prejudice will not be tolerated and will be met with a significant punishment.

> ### 4. A Guidelines Sentence is Necessary to Avoid Unwarranted Sentencing Disparities (18 U.S.S.C. § 3553(a)(6))

A guideline sentence is not disparate; it is well supported by the Guidelines and the §3553 factors, and is what justice requires. Further, a guidelines sentence in this case is in line with similarly situated cases.

In June of this year, following a jury trial, the United States District Court for the District of Montana sentenced John Howald to 96 months of imprisonment for his conduct in firing a weapon into the home of a victim because of the victim's perceived sexual orientation. *United States v. Howald*, 6:21-cr-4 (D. Mont. 2023). He was sentenced to 120 additional months, to run consecutively, for discharging the weapon during a crime of violence. *Id.* Like this case, no one was physically injured. Unlike this case, defendant Howald targeted one victim; the Defendant here targeted six.

In 2011, following a jury trial, the Western District of Washington sentenced Zachary Beck to 51 months imprisonment for his conduct in shouting racial slurs

---

**2015**: 5,850 reported incidents, 56.9% of single-bias incidents motivated by racial bias (https://ucr.fbi.gov/hate-crime/2015/topic-pages/incidentsandoffenses_final)

**2014**: 5,479 reported incidents, 47.0% of single-bias incidents motivated by racial bias (https://ucr.fbi.gov/about-us/cjis/ucr/hate-crime/2014/topic-pages/incidentsandoffenses_final)

while attempting to hit (with his fist) a Black man he had encountered at a bar. *United States v. Beck*, 3:100cr05553 (W.D.Wash. 2011). Two co-conspirators threw bottles, and one attempted to stab the victim with a knife as he fled. Like this case, Beck threatened the victim to leave or else there would be a problem. Like this case, the victim suffered no physical injuries. However, in *Beck*, the defendant was convicted of attacking one victim, not six. Beck's co-conspirator pled guilty and accepted responsibility for his conduct. He was sentenced to 34 months. *Id.*

This Court, faced with a defendant convicted of six bias motivated crimes involving a dangerous weapon, should hold this Defendant accountable and impose a guidelines sentence.

## IV.    CONCLUSION

Based on the nature and circumstances of the offense, and the need for both specific and general deterrence, the United States respectfully asks that this Court impose a sentence within the guideline range articulated in the Presentence Investigation Report, as necessary to reflect the seriousness of the offense, promote

respect for the rule of law, and demonstrate the public interest in preventing a recurrence of the offense.

SUBMITTED this 16th day of October, 2023.

JASON COODY
United States Attorney

*/s/ Kaitlin Weiss*
KAITLIN WEISS
Assistant United States Attorney
Northern District of Florida
Florida Bar Number: 106130
111 North Adams Street, Fourth Floor
Tallahassee, Florida 32301
Kaitlin.Weiss@usdoj.gov

*/s/ Laura-Kate Bernstein*
LAURA-KATE BERNSTEIN
Trial Attorney
Civil Rights Division, Criminal Section
United States Department of Justice
Maryland Bar Number 1212110224
950 Pennsylvania Ave. NW
Washington, DC 20530
Telephone: (202) 598-3519
Facsimile: (202) 514-8336
Laura-Kate.Bernstein2@usdoj.gov

*/s/ F. T. Williams*
F. T. WILLIAMS
Assistant United States Attorney
Florida Bar No. 936219
300 E. University Ave, Suite 310
Gainesville, Florida 32601
(352) 378-0996
Frank.Williams@usdoj.gov

16

## **CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F)**

I hereby certify, pursuant to N.D. Fla. Loc. R. 7.1(f), that this filing complies with the word limit and contains 3,835 words.  In making this certification, I have relied upon the word-count feature of Microsoft Word.

/s/ Kaitlin Weiss
KAITLIN WEISS
Assistant United States Attorney

.

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing has been filed via the Court's CM/ECF system on this 16th day of October 2023, which will send notification of such filing to all counsel of record.

/s/ Kaitlin Weiss
KAITLIN WEISS
Assistant United States Attorney